## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GREENSTAR TECHNOLOGIES, LLC and BLUE SURGE TECHNOLOGIES, LLC, | Civil Action No.: 3:23cv-21293-MAS-JBD |
| Plaintiffs, | **FOURTH AMENDED COMPLAINT AND JURY DEMAND** |
| v. | |
| RAMAKRISHNA REDDY GOURU, LG ELECTRONICS USA, INC., AKHIL KARUNAKARAN, JOHN DOES 1 through 5 and ABC CORPORATIONS 1 through 5, | |
| Defendants. | |

Plaintiffs, Greenstar Technologies, LLC, a New Jersey limited liability company with a principal place of business currently at 270 Davidson Avenue, Suite 102A, Somerset, New Jersey 08873, and Blue Surge Technologies, LLC, a New Jersey limited liability company with a principal place of business also currently located at 270 Davidson Avenue, Suite 102A, Somerset, New Jersey 08873, by way of Fourth Amended Complaint as against Defendants Ramakrishna Reddy Gouru; LG Electronics USA, Inc.; Akhil Karunakaran; John Does 1 through 5 and ABC Corporations 1 through 5, hereby allege and say:

## JURISDICTION AND VENUE

1.     Plaintiff, Greenstar Technologies, LLC ("Greenstar"), is a New Jersey limited liability company with a principal place of business currently located at 270 Davidson Avenue, Suite 102A, Somerset, New Jersey 08873.  Its sole owner is a resident of the State of New Jersey.

2.      Plaintiff, Blue Surge Technologies, LLC ("Blue Surge"), is a New Jersey limited liability company with a principal place of business also currently located at 270 Davidson Avenue, Suite 102A, Somerset, New Jersey 08873.  Its sole owner is Greenstar.

3.      Defendant, Ramakrishna Reddy Gouru ("Gouru") is a resident of Belle Mead, New Jersey.

4.      Defendant, LG Electronics USA, Inc.'s ("LG") principal place of business in the United States and the location from which some of the trade secrets were stolen and/or illegally accessed is, upon information and belief, located in Englewood Cliffs, New Jersey.

5.      Defendant, Akhil Karunakaran ("Karunakaran") was at all relevant times a resident of Somerset, New Jersey. Upon information and belief, he has since relocated to India.

6.      Plaintiffs, Greenstar and Blue Surge, are bringing this action pursuant to the Economic Espionage Act, 18 U.S.C. §§1831 – 1839.  This Court possesses jurisdiction over this action pursuant to 18 U.S.C. §1836(c).

7.      Plaintiffs also bring this action under the Computer Fraud and Abuse Act, 18 U.S.C. §1030.

8.      Plaintiffs also assert claims pursuant to the Racketeer Influenced and Corrupt Organizations Act with this Court having jurisdiction pursuant to 18 U.S.C. § 1965.

9.      This Court also possesses jurisdiction over this action pursuant to 28 U.S.C., Section 1331.

10.      Plaintiffs also assert claims for theft of trade secrets, wrongful conversion and civil conspiracy over which this Court possesses pendant, supplemental and/or concurrent jurisdiction.

11.     This is the correct venue pursuant to 28 U.S.C. §1391 in that the Plaintiffs and the Defendants are located in New Jersey and/or a substantial part of the events giving rise to the claims occurred in New Jersey.

## INTRODUCTION

12.     This is an action by Plaintiffs to recover damages arising from the planning and execution of a scheme and pattern of activities by Gouru and others to blatantly steal trade secrets, proprietary technology and data that had been developed by Plaintiffs over a period of years and at a cost of tens of millions of dollars.

13.     This case also involves corporate espionage and theft committed by Gouru; by others employed by LG, Gouru's current employer; by employees of LG's parent company, one of the world's largest electronics and consumer appliance manufacturers, and by LG itself.

14.     As set forth in detail below, an affiliated company of Plaintiffs engaged Gouru as an employee and a key member of Plaintiffs' team to develop groundbreaking technologies and software platforms for real-time data analysis from the Internet of Things ("IoT"), using advanced Artificial Intelligence ("AI") tools and applications. These innovative AI-driven solutions and other state-of-the-art technologies were developed by Plaintiffs over years, with an investment of tens of millions of dollars.

15.     Possibly before but definitely after terminating his employment with the company affiliated with Plaintiffs to join LG as Director of Data Solutions, Gouru planned and engaged in a series of egregious and illegal activities, repeatedly illegally gaining access to Plaintiffs' computer server network. Over the course of dozens of occasions and hundreds of hours, Gouru unlawfully accessed Plaintiffs' servers to download and steal substantial amounts of Plaintiffs' trade secrets. Plaintiffs' trade secrets that Gouru stole include, without limitation, two (2)

platforms, seven applications for those platforms, two (2) protocols, one (1) algorithm, two (2) methodologies, one (1) module, one (1) architecture and one (1) schema. More specifically, the trade secrets (hereinafter "Greenstar Trade Secrets") which Gouru stole consist of the following:

 **(a)** Plaintiffs' SurgeCloud IoT Platform. This platform accepts data from sensors developed by or on behalf of the Plaintiffs and sends the data to an IoT (Internet of Things) Hub. The precise sensor utilized would be dependent upon the application in connection with which the platform was being utilized. The applications are addressed in greater detail below. In addition to the sensor and the Hub, the Platform consists of components also addressed in detail below. The data would be processed via a data center with the data, which can be massive, run through an analytics algorithm as it is created so customers can set parameters on what information is worth sending to a cloud for later use and what is not. The data which the customers want stored is stored in the cloud and is also forwarded to the customers based upon whatever application(s) they selected. As is true with many trade secrets of many companies involved in the high tech industry, it is the precise combinations of the components and/or the customization thereof that comprise the valuable trade secrets. This platform is comprised of over 7.5 million lines of code. (Plaintiffs are unable to do a current precise count since Gouru breached their cloud infrastructure and deleted files which would be included in the count but Plaintiffs have not, without discovery, been able to determine precisely what was deleted). The proprietary technologies and frameworks underpin the core functionalities of the SurgeCloud IoT platform. That platform's core functionalities rest on a mix of low-level embedded code, high-performance stream-processing engines, scalable data stores, and modern web-

service frameworks. The technologies and frameworks that are central to its architecture are as follows.

(1) Edge and Gateway Software

- C/C++ for embedded firmware and the custom IoT Data Serialization Algorithm (SurgeCloud_encoder.c / SurgeCloud_decoder.c)

- Go for the real-time analytics microservice (edge_compute.go) that integrates with Apache Spark Streaming jobs

- Certificate-based mutual TLS using OpenSSL libraries, configured by g2021es_cert_config.json and implemented in g2021es_handshake.c

(2) Stream Ingestion and Processing

- Microsoft Azure Event Hubs or Apache Kafka for high-throughput message ingestion

- Apache Spark Streaming for sub-50 ms micro-batch analytics at the cloud core

- Kubernetes or Azure Databricks to host and auto-scale Spark jobs

(3) Data Storage and Modeling

- Apache Cassandra as the primary time-series database, using CQL scripts (telemetry_schema.cql) optimized for 400,000 messages/day per hub

- Azure Blob Storage for cold-archive telemetry and long-term data retention

- Redis or Apache Ignite for in-memory rule engines and configuration caches

(4) Microservices and APIs

- .NET Core Web API for device management, data retrieval, and administration endpoints

- Node.js/TypeScript microservices for real-time data feeds and integration tasks

- OAuth 2.0 and Azure Active Directory for identity-and-access management, with multi-factor authentication

(5) Front-End Frameworks

- Angular or React for responsive dashboards and the Low-Code Platform Builder
- Redux-style state management (store.js / dispatcher.ts) to ensure predictable UI flows
- D3.js for interactive data visualizations and monitoring panels

(6) DevOps, Security, and Scalability

- Docker containers and Kubernetes (or Azure Service Fabric) for packaging and orchestration
- Azure DevOps or GitHub Actions CI/CD pipelines for automated builds, tests, and rollouts
- Role-based ACLs, IP whitelisting, and audit-logging across all layers
- Secure OTA updates for edge gateways with rollback capability

  Together, these components and technologies enable SurgeCloud to deliver secure, low-latency IoT data collection, real-time analytics, and scalable cloud services while providing rich web-based management and visualization tools.

(7) Languages: various programming languages and databases also form the backbone of the SurgeCloud IoT platform. It relies on a mix of low-level, system, and high-level service languages paired with a suite of scalable, time-series and in-memory data stores, as follows:

- C / C++: Core gateway firmware and the proprietary SurgeCloud IoT data serializer (SurgeCloud_encoder.c / SurgeCloud_decoder.c).

- Go: EdgeComputeEngine real-time analytics microservice integrating with Apache Spark Streaming.

- Java / Scala: Spark Streaming jobs for sub-50 ms telemetry processing in the cloud core.

- C# (.NET Core): Backend APIs for device management, data ingestion, and administration endpoints.

- JavaScript / TypeScript:
  - Node.js services handling real-time data feeds and integration tasks.
  - Front-end Angular or React dashboards and the Low-Code Platform Builder.

(8) Databases and Data Stores

- Apache Cassandra: Primary time-series database using a custom CQL schema optimized for 400,000 messages/day per hub.

- Azure SQL: Relational store for metadata, configuration data, and user management.

- Redis / Apache Ignite: In-memory caches for rule engines, session state, and configuration lookups.

- Azure Blob Storage: Cold storage archive for telemetry and long-term data retention.

- Kafka / Azure Event Hubs (message broker): High-throughput ingestion layer feeding Spark Streaming and downstream consumers.

**(b)**    Plaintiffs' Mobile Business Processor, which is itself a platform that supplements the SurgeCloud IoT Platform so that the data obtained by the SurgeCloud IoT Platform is digitized so it can be procured on a mobile device.    The Mobile Business Processor ("MBP") platform integrates several key artificial intelligence ("AI") tools to enhance its functionality and drive digital transformation. These tools primarily revolve around AI-powered agents and machine learning capabilities. See Exhibit A.[1] The core AI components are:

- Autonomous AI/ML-Powered System Agents: The MBP utilizes virtual software agents powered by Artificial Intelligence (AI) and Machine Learning (ML). These autonomous agents possess assisted and self-learning capabilities, designed to drive digital transformation, automate solutions, and improve process efficiencies. The agents are AI/ML-powered agents which monitor workflows in real time, flagging deviations (e.g., unauthorized data access, equipment malfunctions) and enforcing compliance.  They analyze historical data to refine scheduling, resource allocation, and task prioritization, reducing manual intervention and they can predict equipment failures and recommend preemptive actions.  These agents function as a "digital workforce," capable of automating complex tasks and developing real-time business strategies.

- Cloud-Based Virtual Agents: The platform employs cloud-based virtual agents specifically for tasks such as anomaly detection and ensuring process compliance within business operations. These AI/ML-powered agents continuously analyze

---

[1] Due to the confidential nature of the documents, Exhibit A through Exhibit G will be the subject of an application to file with the Court under seal and will be provided to Defendants' counsel subject to a protective or confidentiality order.

data streams from IoT devices (e.g., smart meters, grid sensors) and mobile workforce inputs to detect anomalies like fuel theft, equipment malfunctions, or unauthorized access agents. AI agents process real-time sensor data to predict equipment failures (e.g., transformers, distribution lines) and recommend preemptive maintenance, reducing downtime. The agents also simulate "what-if" scenarios (e.g., demand spikes, grid outages) using historical and live data to optimize workforce scheduling and resource allocation. They also refine business rules and workflows by analyzing historical performance data. For instance, they adjust field technician schedules dynamically to minimize travel disruptions.

- Augmented System Bots (Surge Bots): Greenstar Technologies has developed "Augmented System Bots," also referred to as "Surge Bots." These are AI/ML-powered, self-contained system models or agents that observe system changes in dynamic environments. They manage digital twins and are self-learning, evolving over time. The primary objectives of these Surge Bots are to manage and optimize assets within utility infrastructures and to provide expertise for automated diagnosis and problem resolution with minimal human intervention. The surge bots are advanced AI/ML-powered agents designed to autonomously optimize utility infrastructure through real-time asset management, digital twin integration, and self-learning capabilities. They continuously observe system changes in IoT-driven environments, analyzing data streams from sensors, smart meters, and grid infrastructure. They also create and maintain virtual replicas of physical assets (e.g., transformers, distribution lines) to simulate performance under varying conditions and also refine operational rules using reinforcement learning, adapting

to historical data and real-time anomalies (e.g., voltage fluctuations, equipment degradation). Lastly, they also execute root-cause analysis for faults (e.g., pipeline leaks, circuit failures) and prescribe corrective actions (e.g., rerouting power, triggering maintenance alerts.

- Natural Language Processing (NLP): The MBP platform combines its pre-defined business rules with capabilities offered by Natural Language Processing. This integration empowers the "digital workers" created by AI technologies to automate complex tasks and analyze business strategies.

These AI tools enable the MBP to digitize repeatable business processes, optimize workforce deployment, and provide advanced analytics and business intelligence

**(c)** The SurgeCloud IoT Platform application for generators controls when to turn a generator on or off and also determines when it needs maintenance. It includes monitors that provide real-time data from any location and allows remote troubleshooting. It also addresses when refueling will be necessary. It includes monitors that provide data to the control center as to engine batteries, coolant temperatures, the ignition, the generator's ability to run, its rpm and desired rpm, its solenoid status, the engine crank starter, the generator's fuel level and oil pressure, its fuel temperature, its intake manifold temperature, the engine fuel rate and error codes and also provides to the control center extensive information as to the alternator. Said data is then stored in the cloud or, if necessary, sent to the customer upon receipt by the control center when urgent (based upon parameters determined with the customer).

**(d)** The SurgeCloud IoT Platform application for Off Highway vehicles, which generally include construction equipment, mining equipment and/or other vehicles that are

not driven on highways. This application also involves sensors reporting to the control center.  It includes the real-time monitoring of the vehicle's engine electronic control module and other vehicle control modules, such as the transmission control module and the body controls module.  It also includes the utilization of artificial intelligence at the gateway enabling smart edge analytics of the vehicle and high frequency data sampling for data logging functionality.  The application further involves the optimization of use of the vehicle through advanced analytics and artificial intelligence which increases fuel efficiency and uptime; provides input as to what maintenance will be required and when; reports all incidents resulting in damage to the vehicle and reports on operation by the vehicle operator so as to achieve fuel efficiency and safe use.

**(e)**      The SurgeCloud IoT Platform application for On Highway vehicles, which generally include trucks, buses and/or automobiles (vehicles driven on highways).  This application also involves the use of sensors that provide data to the control center.  The information provided involves the location of goods and vehicles, using GPS and radio frequency identification tags; optimization of the route that the vehicle is driven on which involves fewer stops and less fuel consumption; alerts as to delays on the routes;  status updates on driver habits and efficiency which can involve safety and maintenance alerts directly to the driver and also KPI driven reports to reinforce safe and efficient driving habits; provides real-time information and predictive diagnostics of the engine, vehicle condition and tire pressure; tracks information on the condition of refrigeration equipment such as the temperature, humidity, etc. in real-time and provides reports to customers detailing the conditions over the entire route; provides alerts when the vehicle has been involved in an accident and provides the ability to track stolen vehicles. The technologies,

software, data, and other components of this application are the same or similar to those used in LG's (or its parent's) IoT Vehicle Solution system, e.g., https://www.lg.com/global/mobility.

**(f)** The SurgeCloud IoT Platform application for Refrigerated Trucks. This application includes sensors that provide data to the control center for analysis and storage in the cloud with reports to the customers. The application determines the duration of each job delivery or stop; identifies when inefficient routes are being used; identifies vehicle usage out of business hours; monitors exact times that vehicles enter and leave key job sites; identifies stops at non-work-related sites; has an ability to track stolen vehicles; can report excessive speed, harsh braking and harsh acceleration for each driver in order to improve fuel efficiency and reduce the risk of accidents; provides data mining and forecasting tools that allow projection of demand from the history of units shipped as well as the weather and holiday dates; provides GPS tools for managing information by region for tasks such as demand forecasting, pest control and optimizing use and provides maintenance management and an FDD module to ensure that everything is running at peak performance so breakdowns are reduced. The technologies, software, data, and other components of this application are the same or similar to those used in LG's (or its parent's) Cold Chain: Refrigeration and Compressors business, e.g., https://www.lg.com/global/business/compressor-motor/blog/cold-chain-refrigeration-and-compressors.

**(g)** The SurgeCloud IoT Platform application for Energy Management, which relates to controlling air conditioning and/or heat in buildings so as to provide for maximum efficiency and cost savings with respect thereto. This application delivers 5 smart services

to help optimize performance of buildings, consisting of measurement and verification of temperatures; energy analysis; continuous commissioning, fault detection and diagnostics and carbon footprint analysis. It applies over a hundred algorithms to identify anomalies, diagnose their root causes and generate work orders with details about faults, causes, possible solutions, energy waste and potential savings. The technologies, software, data, and other components of this application are the same or similar to those used in LG's (or its parent's) HVAC line of business, e.g., https://www.lg.com/global/business/hvac.

**(h)** The SurgeCloud IoT Platform application for Cold Chain/Cold Room Monitoring. This application is utilized in connection with the monitoring of the temperature/refrigeration in space utilized to store items needing to be stored in a cold area, such as medicines, salad, fruit and/or vegetables. This application involves sensors and an Internet of Things Gateway to gather data from cold storage facilities and transfer the data over the cellular network to a central repository for data information management and analytics. This application also sends alarms directly to the service team using SMS, email and push notification to ensure an immediate response to variation in defined thresholds, such as if a temperature in a refrigerated room drops below whatever temperature the customer sets as the minimum for the room.

**(i)** The SurgeCloud IoT Platform application providing a People Counting Solution, which essentially counts the number of people who ride on busses and trains, go to restaurants and/or view items in a store such as a specific appliance and notes how long people spend inspecting the item in question. This application utilizes non-contact stereoscopic vision technology. Stereoscopic cameras capture images of the area below the device. Due to integrated high luminosity infrared LED indicators, it can operate in

any type of lighting conditions and it can also be used in a wide range of climate conditions. The Counter component is integrated with a Surge Gateway to capture data and transmit it to the cloud platform for further analysis and visualization. The data is then provided to the customers. The technologies, software, data, and other components of this application are the same or similar to those used in LG's (or its parent's) Occupancy Management products and services e.g., https://www.lg.com/us/business/health-protocol-occupancy-management-solutions.

**(j)**    The Communication Protocol. This protocol was specifically developed for device-to-enterprise communication within the IoT platform, taking into account the global digital transformation of data communication. It enabled hardware-agnostic communication protocol, allowing machinery and devices from different companies to seamlessly communicate efficiently in real time. At a time when most companies relied on legacy, non-IoT-era protocols for their computers, machinery, and devices, the Plaintiffs' innovative protocol technology was revolutionary. It facilitated seamless interaction between heterogeneous devices, a critical feature for advancing IoT technology platform.. The Protocol facilitates interoperability across diverse machinery and sensors (e.g., industrial equipment, smart meters) regardless of manufacturer, using standardized data normalization. It supports multi-RF communication (cellular, WiFi, Bluetooth, GPS) to ensure reliable connectivity in dynamic environments. This protocol collects sensor data via configurable drivers for protocols like Modbus, MQTT, and OPC-UA. It also converts raw data into structured JSON/XML payloads, ensuring compatibility with downstream systems; implements bi-directional command execution (e.g., remote device configuration) and prioritizes data streams based on predefined rules and its RESTful APIs and prebuilt

connectors for AWS, Azure, and private cloud platforms enable seamless scalability. The protocol translates raw data from any device—regardless of manufacturer or communication standard—into unified, structured formats (such as JSON or XML). This allows devices from different vendors, with varying native protocols, to communicate seamlessly with enterprise systems and each other.

**(k)**     The "SurgeCloud" IoT Data Serialization Algorithm and Implementation (Codename SurgeCompress): This algorithm was specifically conceived and optimized for the efficient handling and low-latency transmission of high-volume, time-series telemetry data generated by IoT devices within Greenstar's future-ready SurgeCloud platform. The novelty of SurgeCompress lies in its unique combination of, for example, adaptive delta encoding, specialized Huffman coding variants, and a distinctive framing protocol, engineered to achieve superior compression ratios and significantly lower latency compared to standard industry solutions for IoT data. This algorithm also helps to enable real-time data exchange across heterogeneous systems through a modular software architecture designed for interoperability, edge intelligence, and cloud scalability.

It also  supports industrial protocols (Modbus, MQTT, OPC-UA) and IoT standards via configurable drivers, allowing seamless integration with legacy and modern devices.  It collects raw data from sensors, machinery, and smart meters regardless of manufacturer or communication interface and converts heterogeneous data formats (e.g., binary, JSON, XML) into standardized payloads for enterprise systems (ERP, CRM)  It also ensures compatibility across devices by mapping vendor-specific data schemas to a common framework. Below is a detailed breakdown of its structural components and functionalities:

i. *Implementation*: Embodied in critical source code files including, but not limited to, SurgeCloud_encoder.c and SurgeCloud_decoder.c.

ii. *Technical Basis*: The sophisticated design and functionality are further detailed in Plaintiffs' confidential "SurgeCloud IoT Platform Detailed Design Document v1.0.2," particularly Section 12 (Data Model) and related architectural descriptions (Exhibit B, pp. 8, 58).

iii. *Combination*: This advanced algorithm significantly reduces data storage costs and network bandwidth requirements for IoT data streams (e.g., by an estimated 50-60% over standard methods). This efficiency enables Plaintiffs to offer more competitive pricing for their IoT solutions and provides faster data availability for real-time analytics and customer applications, a direct result of the platform's innovative design.

**(l)**      The "SurgeCloud" Cassandra Telemetry Schema:

i. *Description*: A highly optimized and proprietary database schema for Apache Cassandra, ingeniously designed to store and retrieve vast quantities of IoT telemetry data generated by the SurgeCloud platform. This schema features unique definitions for partition keys, clustering keys, and data structures meticulously tailored to support exceptionally high-throughput ingestion (approximately 400,000 messages per day per IoT Hub) and low-latency querying of time-series data, showcasing the platform's robust and scalable architecture.

ii. *Implementation*: Defined in proprietary Cassandra Query Language (CQL) scripts, including but not limited to, the crucial telemetry_schema.cql file.

iii. *Technical Basis*: The schema's innovative design is integral to the data storage and

retrieval strategy outlined in the "SurgeCloud IoT Platform Detailed Design Document v1.0.2" (Exhibit B, pp. 8, 58) and "Platform Architecture - Extended" (Exhibit C, p. 5 showing Cassandra in the data pipeline).

iv. *Economic Value*: This optimized schema enables efficient scaling of the SurgeCloud platform, minimizes database operational costs, and ensures rapid data access for critical platform functions, including real-time alerting and historical data analysis. This provides a significant performance and cost advantage.

v. *Combination*: The schema includes table structures, compaction strategies, and indexing methods.

**(m)**   The "SurgeCloud" Presentation-Layer Store-Dispatcher State Management Architecture:

i. *Description*: A proprietary and innovative software architecture for the SurgeCloud IoT platform's web portal's presentation layer that ingeniously isolates state management from data creation/update and display logic. This architecture employs a unique "Store" and "Dispatcher" pattern to manage application state, handle complex asynchronous operations, and ensure data consistency across sophisticated user interfaces, reflecting a forward-thinking approach to UI development.

ii. *Implementation*: Embodied in JavaScript/TypeScript source code files including, but not limited to, store.js and dispatcher's. iii. *Technical Basis*: This architecture is a core innovative component of the "SurgeCloud Presentation Layer" as described in the "SurgeCloud IoT Platform Detailed Design Document v1.0.2" (Exhibit B, p.8, 10-11, Figure 3).

iv. *Operations*: This advanced architecture enhances the scalability, maintainability, and testability of the SurgeCloud portal. It significantly improves performance by enabling preemptive data fetching and eliminates common UI issues like race conditions, leading to a more robust, responsive, and superior user experience—key differentiators in the IoT market .

v. *Combination*: This uses data flow patterns, and event handling logic of this Store-Dispatcher model.

**(n)**    The "EdgeComputeEngine" Real-Time Analytics Module:

i. *Description*: An innovative software module designed for edge computing devices, enabling powerful real-time analysis of IoT data streams at or near the source. This module leverages Apache Spark Streaming and uniquely includes custom-developed message parsers and advanced analytics algorithms. These are designed to process incoming telemetry and execute predefined rules or machine learning models within extremely low latency thresholds (e.g., within 50 milliseconds of data receipt).

ii. *Implementation*: Embodied in source code files including, but not limited to, edge_compute.go .

iii. *Technical Basis*: This module is part of the "Edge Compute and Analytics" layer of the SurgeCloud IoT Stack (Exhibit C, p. 12; Exhibit D, pp. 5-6 discussing edge capabilities). The strategic use of Apache Spark for stream processing is noted in Exhibit B, p. 8.

iv. *Operations*: Enables rapid, localized decision-making, reduces reliance on cloud processing for urgent tasks, minimizes data transmission to the cloud, and allows for sophisticated real-time monitoring and control in industrial IoT applications. This provides

a distinct competitive edge and significant operational efficiencies for users of the SurgeCloud platform .

v. *Combination*: It involves custom message parsers, specific Spark Streaming configurations, proprietary analytical algorithms, and integration architecture for the EdgeComputeEngine.

**(o)** The G2021ES Gateway Handshake and Communications Protocol:

 i. *Description*: A proprietary, highly secure communication protocol, innovatively developed for the G2021ES Multiservice Gateway. See Exhibit E. It facilitates secure and reliable data exchange between the gateway, connected IoT devices, and the SurgeCloud platform. This protocol includes a unique certificate-based mutual authentication mechanism and a custom session-key exchange process, reflecting a deep understanding of IoT security requirements 1.

ii. *Implementation*: Detailed in the confidential "G2021ES Multiservice Gateway Specifications," Appendix B, and embodied in firmware and software, including files like g2021es_handshake.c and g2021es_cert_config.json. (Exhibit E, p.21 "G2021ES - Integration Protocols"). iii. *Technical Basis*: The protocol ensures secure device onboarding, encrypted data transmission, and authenticated command and control functions for the G2021ES gateway, forming a cornerstone of the SurgeCloud platform's security infrastructure. iv. *Operations*: Provides robust security for sensitive IoT data, prevents unauthorized access to devices and the network, and builds trust in the reliability and integrity of the SurgeCloud ecosystem connected via these gateways. v. *Combination*:

Cryptographic implementations, handshake sequences, certificate management processes, and session key generation methods.

**(p)**    The "SurgeCloud" OKD4 Microservices Platform Installation and Configuration Methodology: i. *Description*: A proprietary and innovative methodology for installing and configuring OpenShift Container Platform 4.X (OKD4) to convert the SurgeCloud platform into a production-grade microservices architecture. See Exhibit F. This methodology includes unique user-provisioned installation procedures for bare-metal or other environments, specific configurations for bootstrap, control plane, and compute machines, and a tailored jump host setup incorporating load balancing, HTTP server, and image persistent volumes. It establishes a (CI/CD) Continuous Integration architecture, improves security practices, and enables the platform core to host multiple applications and use cases for the SurgeCloud ecosystem. ii. *Implementation*: Embodied in the detailed configurations, commands, specific parameters (e.g., for networking, DNS entries for surgecloud.lan and okdprod.surgecloud.lan, install-config.yaml settings including base domain surgecloud.lan and cluster name okdprod, custom nginx load balancer rules), and step-by-step procedures documented in Plaintiffs' confidential "okd4-Installation-SurgeCloud-1.docx". iii. *Technical Basis*: The comprehensive internal guide "okd4-Installation-SurgeCloud-1.docx" documents this unique, tailored deployment for the SurgeCloud platform. iv. *Operation*: This bespoke OKD4 deployment methodology and configuration for SurgeCloud establishes a robust, scalable, and secure production-grade microservices architecture. It enables efficient CI/CD pipelines, supports hosting multiple applications, enhances security practices, and optimizes resource utilization. This leads to accelerated development cycles, increased operational stability, and reduced infrastructure

costs specifically tailored to the SurgeCloud platform's advanced IoT operational needs.

v. *Combination*: The complete set of detailed configurations, specific parameters (including IP addresses, 71.59.82.228; 136.166.251.100; 124.56.66.38 domain names embedded in configuration files, and script logic), proprietary installation procedures, and integration methodologies documented in "okd4-Installation-SurgeCloud-1.docx."

(q) The "SurgeCloud" Rancher-Kubernetes Microservices Platform Installation and Configuration Methodology:

i. *Description*: A proprietary and innovative methodology for deploying and configuring a Rancher-managed Kubernetes cluster (RKE2/K3s) to transform the SurgeCloud IoT platform into a production-grade microservices architecture. See Exhibit G. This includes a unique user-provisioned infrastructure (UPI) installation method for bare-metal environments, a specifically defined setup for the Rancher server and cluster nodes (etcd, Control Plane, Worker roles), and custom networking and firewall configurations. This methodology integrates (CI/CD) Continuous Integration, enhances security, and enables the SurgeCloud platform core to host multiple diverse applications and use cases .

ii. *Implementation*: Embodied in the detailed steps, proprietary scripts (e.g., the rancher.sh script with specific k3s version v1.24.8+k3s1 and parameters like --no-deploy traefik --no-deploy local-storage), specific Helm chart installation commands for cert-manager and Rancher (e.g., hostname=platform.bluesurge.com), chosen Kubernetes version (v1.24.xx), Calico container networking, and specific agent environment variables (HTTP_PROXY, HTTPS_PROXY, NO_PROXY with internal network details) as meticulously documented in Plaintiffs' confidential "Rancher-kubernetes-Installation-V0P3.docx" .

21

iii. *Technical Basis*: The comprehensive internal guide "Rancher-kubernetes-Installation-V0P3.docx" details this unique, tailored deployment strategy for the SurgeCloud IoT platform.

iv. *Operation*: This custom Rancher-Kubernetes setup provides a resilient, centrally managed, and production-ready microservices environment for the SurgeCloud platform. It facilitates streamlined CI/CD processes, significantly improves the security posture, and offers the flexibility to host a wide array of applications. These benefits result in enhanced operational efficiency, faster time-to-market for new IoT services, and a highly scalable infrastructure specifically adapted to SurgeCloud's unique and complex requirements.

v. *Combination*: This involves a set of specific configurations (including detailed proxy settings, internal domain names, script logic, and Helm deployment parameters), step-by-step proprietary installation processes, node role assignments, and unique integration techniques documented in "Rancher-kubernetes-Installation-V0P3.docx" which involve deploying Rancher-Kubernetes for an advanced IoT platform.

16.    The Greenstar Trade Secrets, detailed herein, are the culmination of many years of pioneering work and profound experience by the Plaintiffs in the Internet of Things (IoT) and digital technology transformation space. This deep-seated expertise has driven the development and innovation of the SurgeCloud IoT Platform, a uniquely architected, future-ready IoT ecosystem. The platform embodies groundbreaking solutions, meticulously engineered to address complex challenges in IoT data management, analytics, security, and scalable deployment.

17.    The Greenstar Trade Secrets, born from this extensive experience and significant investment, represent critical components of the SurgeCloud IoT Platform's distinctive competitive advantage and market-leading capabilities. The Greenstar Trade Secrets were

meticulously developed over more than seven years at a cost exceeding $25 million, reflecting the Plaintiffs commitment to cutting-edge innovation in the IoT domain.

18.    The Greenstar Trade Secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons or entities who could obtain economic value from their disclosure or use. Plaintiffs consistently took reasonable and diligent measures to keep  the Greenstar Trade Secrets secret.

19.    Much of the illegal and unauthorized access obtained by and/or on behalf of Gouru and/or LG, which was part of a pattern of illegal racketeering activity described in greater detail below, was made and/or attempted from Gouru's home in Belle Mead, New Jersey.  Such access was obtained by Gouru on twenty-two (22) occasions for a total of over four hundred seventy (470) hours as reflected on Exhibit H annexed hereto and incorporated herein. The unauthorized and illegal access occurred between September 18, 2023 and October 5, 2023.

20.    Additional illegal and unauthorized access was made and/or attempted from LG's headquarters in Englewood Cliffs, New Jersey.  That access occurred on five (5) occasions for a total of over twenty-seven (27) hours as reflected on Exhibit I annexed hereto and incorporated herein.  That occurred between September 18, 2023 and October 5, 2023.

21.    Upon information and belief, others at LG had to be aware of and approve Gouru's unauthorized and illegal access because gaining access to another company's server to download input should have placed others on notice that same was occurring and they would have had to approve such activities by Gouru.

22.    In addition, Gouru was sent by his superior(s) at LG to its corporate parent's headquarters in Seoul, South Korea to demonstrate some or all of the Greenstar Trade Secrets to which he gained unauthorized access and stole from Plaintiffs.

23.    Furthermore, Gouru, as an employee of LG, advised one or more employees of LG's parent company how to attempt to gain unlawful access to Plaintiffs' servers from their corporate computer and/or other computers for the purpose of illegally viewing and/or stealing Plaintiffs' trade secrets.  In that regard, they sought to gain unauthorized and/or illegal access on at least thirty-one (31) separate occasions from LG's parent's location in South Korea.  Gouru also went to South Korea, as an employee of LG, to market Plaintiff's trade secrets to LG's parent company.  Gouru's activities in South Korea and with employees of the parent company in South Korea were as an employee of LG.

24.    The aforesaid  activities were intended to allow either LG or its parent company or both to utilize the stolen Greenstar Trade Secrets for purposes of their business.  The data that could be obtained from use of the stolen Greenstar Trade Secrets would have tremendous value to their businesses, now and in the future.

25.    Upon information and belief, either LG or its parent company or both have been using and/or are still intending to utilize the Greenstar Trade Secrets with respect to its/their business.

26.    After successfully stealing the Greenstar Trade Secrets, Gouru leveraged his intimate familiarity with the architecture of the Plaintiffs' cloud computing infrastructure and deliberately accessed and deleted critical files from Plaintiffs' essential servers.  That was done

with the malicious intent to paralyze the Plaintiffs' entire cloud infrastructure and render it impossible for Plaintiffs to compete with LG and/or its parent company.

27.    Gouru's deletion of portions of the Greenstar Trade Secrets undermined the Plaintiffs' ability to reliably log in to and access their own servers and the Greenstar Trade Secrets stored thereon. This act of destruction not only eradicated the value of the Plaintiffs' painstakingly developed Greenstar Trade Secrets  but also deprived Plaintiffs of any ability to benefit from them, underscoring the premeditated and malicious nature of Gouru's actions on behalf of LG.  Gouru's deliberate acts, done solely to benefit LG and himself as a LG employee, also eliminated the likelihood of Plaintiffs selling these extremely valuable trade secrets  to LG's competitors.

28.    Upon information and belief, LG actively recruited Gouru specifically to gain access to and use Plaintiffs' technology, including the Greenstar Trade Secrets. The Greenstar Trade Secrets, while constituting Plaintiffs' trade secrets and proprietary information, were/are extremely valuable to LG, which had unsuccessfully tried to develop similar platforms and/or applications for many years.

29.    Upon information and belief as well as for reasons stated above, once Gouru began working for LG, LG collaborated with him and encouraged him to access and steal the Greenstar Trade Secrets. The objective was to steal and convert the value of the Plaintiffs' trade secrets and technology for the benefit of LG and/or its parent corporation, thus demonstrating a concerted and malicious effort to undermine the Plaintiffs' business.  LG's efforts were of great benefit to LG and caused Plaintiffs to lose substantial amounts of money, involving potentially hundreds of millions of dollars.

## ADDITIONAL FACTS COMMON TO ALL COUNTS

### Plaintiffs' Development of the Trade Secrets

30.    Over a period of more than seven years, Plaintiffs Greenstar and Blue Surge have developed Internet of Things ("IOT") software platforms and applications, protocols, an algorithm, module, architecture, methodology and schema as well as cloud computing, primarily from their offices in Somerset, New Jersey.

31.    In connection with their businesses, Plaintiffs have developed and/or acquired ownership of trade secrets as defined in 18 U.S.C. §1839 (3), including the Greenstar Trade Secrets.  They have undertaken reasonable precautions to keep such information secret and the information derives economic value from not being generally known to and/or not being readily ascertainable through proper means by another person or company who can obtain economic value from the disclosure or use of the information.

32.    Defendant  Gouru was employed by Pacific Controls Cloud Services, Inc. ("PCCS") until he resigned effective July 19, 2023.  PCCS provided various cloud services to its customers, including Plaintiffs.  In doing so, PCCS and Gouru specifically gained intimate knowledge of and access to Plaintiffs' groundbreaking trade secrets and technology, including the Greenstar Trade Secrets.

33.    Because of his access to Plaintiffs' and others' trade secrets and confidential information, Gouru was required to, and did, execute a Confidentiality Agreement and an Employment Contract, both of which required him to keep all trade secrets that he was provided access to, including the Greenstar Trade Secrets, confidential and to not disclose same.   Gouru also was fully aware that PCCS had one or more agreements with the Plaintiffs whereby PCCS

was obligated to keep the Plaintiffs' trade secrets, including the Greenstar Trade Secrets, confidential.

34.    PCCS  was also located at 230 Davidson Avenue in Somerset, New Jersey during the relevant time period.  As Gouru well knew, Plaintiffs were PCCS's customers.

35.   For many years, while Gouru was employed by PCCS and/or its parent company, Pacific Control Systems, LLC located in Dubai, United Arab Emirates ("UAE"), where he resided before relocating to the United States, Gouru was a trusted employee who was the leader of a team of employees working on developing one or more IoT software platforms and related applications, protocols, architecture, methodology, algorithms, and/or schema including the Greenstar Trade Secrets.

36.    Gouru was well aware of the Plaintiffs' trade secrets, including the Greenstar Trade Secrets.  Once he left PCCS's employ, any rights he had to access such trade secrets, including the Greenstar Trade Secrets,  were terminated.

37.    The SurgeCloud IoT Platform, as Gouru had been advised, also had great benefit to the energy utility industry. Plaintiffs had reasons to believe that the Greenstar Trade Secrets could have generated at least hundreds of millions of dollars from their marketing of it to the energy utility industry and/or to LG's competitors.

38.    As Gouru was aware, the Greenstar Trade Secrets took more than seven years for Plaintiffs to develop at a cost of over twenty-five million dollars ($25,000,000.00).

39.    Gouru also participated in the development of one or more of Plaintiffs' business plans for the  Greenstar Trade Secrets , which forecasted that Plaintiffs would generate hundreds of millions of dollars in income therefrom .

40.     The Greenstar Trade Secrets were critical to the Plaintiffs' businesses and Plaintiffs had exercised efforts to keep them confidential since the utilization by others (other than through Plaintiffs' efforts) and/or disclosure thereof would damage their business tremendously. Those Greenstar Trade Secrets were used in connection with Plaintiffs' offerings to their customers and potential customers and Plaintiffs had intended to continue to market them, with prospects of generating substantial dollars (hundreds of millions if not billions of dollars) therefrom. Plaintiffs undertook extensive and reasonable measures to keep the Greenstar Trade Secrets confidential, reflecting their high value and importance. These measures included, but were not limited to: a. Requiring employees and contractors with access to sensitive information, including Defendant Gouru during his employment with PCCS, to execute comprehensive confidentiality and non-disclosure agreements. b. Storing all source code and critical design documents in restricted-access directories. c. Implementing robust technical security measures such as super admin password, IP whitelisting, stringent role-based access controls (RBAC), firewalls, and detailed audit logging for server access. d. Strictly limiting access to the full source code and detailed architectural designs, including proprietary installation and configuration guides to a small, trusted group of personnel and key development team members. e. Consistently marking sensitive design documents as "Confidential" (e.g., Exhibit B, "BlueSurge Confidential"). The installation guides for OKD4 2 and Rancher-Kubernetes 3 were internal, confidential documents.

**Defendants' Theft and Conversion of the Trade Secrets**

41.     Defendant Gouru was employed by PCCS until he resigned effective July 19, 2023.

42.     As set forth above, immediately after the effective date of his resignation from PCCS, Gouru was unequivocally no longer authorized to access Plaintiffs' computer platform, their servers and/or any of their computers and/or related equipment.

43.     Upon information and belief, immediately after terminating his employment with PCCS, Gouru became an employee of LG. Upon information and belief, LG, directly and/or indirectly, approached Gouru about employment with LG because of his knowledge and expertise with respect to Plaintiffs' trade secrets, including the Greenstar Trade Secrets.

44.     Starting on or about September 18, 2023, approximately only 2 months after he started his employment with LG, Gouru wrongfully and repeatedly gained access to Plaintiffs' Cloud Computing Infrastructure, which consisted of a cluster of Virtual Servers in the Microsoft AZURE cloud services and upon which the Greenstar Trade Secrets were stored. Such unauthorized and illegal access was from his house and his current place of employment with defendant LG. After commencing his employment with LG, Gouru exploited his ability to download this critical data during his hundreds of hours of unauthorized access.

45.     While he gained such illegal and unauthorized access, he stole the Greenstar Trade Secrets of the Plaintiffs.

46.     In order to illegally gain such access, Gouru used a "compute super admin login" – which had been reserved for a select few members of Plaintiffs' technology development team while employed by Plaintiffs or PCCS – to gain complete control over the Greenstar Trade Secrets, allowing Defendants to modify, download, and then delete essential source code which comprised part of the Greenstar Trade Secrets. Gouru had been granted access to that login while employed

by PCCS because of his involvement with the development of Plaintiffs' trade secrets. However, Plaintiffs' permission for Gouru to utilize it ceased upon his cessation of employment with PCCS.

47.    During Gouru's unauthorized access, he also, on behalf of LG, modified, downloaded, and deleted some of the code comprising the Greenstar Trade Secrets, to disrupt the platform infrastructure for the benefit of Gouru's current employer, LG. As indicated above, the SurgeCloud IoT platform is a multi-layered Internet-of-Things (IoT) solution that spans edge devices, gateways, cloud services, and presentation layers. It implements a modular, microservices-based architecture with specialized source code  components – which Gouru modified, downloaded and deleted – for data serialization, real-time analytics, device management, and secure communication. SurgeCloud is organized into four primary layers: the Edge Layer, the Gateway Layer, the Cloud Core, and the Presentation/API Layer3.

- Edge Layer: Runs on purpose-built multi-technology gateways (Surge Gateway), handling device connectivity, lightweight analytics, and data buffering.

- Gateway Layer: Implements certificate-based mutual authentication ("G2021ES Gateway Handshake Protocol" in g2021es_handshake.c and g2021es_cert_config.json), processes raw telemetry, and forwards it to cloud ingestion endpoints via secure MQTT, AMQP, or HTTPS transports3.

- Cloud Core: Hosts ingestion, stream processing, storage, and analytics modules on Microsoft Azure. Core components include the SurgeCloud Data Serialization Algorithm (SurgeCloud_encoder.c/SurgeCloud_decoder.c), Apache Spark Streaming jobs (edge_compute.go), and Cassandra telemetry schemas (telemetry_schema.cql)15.

- Presentation/API Layer: A .NET Core microservices framework exposes RESTful Web APIs, Angular/React front-ends for device administration, dashboards, and the Low-Code Platform Builder14.

With respect to Data Flow and Processing involved with the SurgeCloud IoT Platform:

a. Device Connectivity: IoT devices communicate with the Surge Gateway using multiple protocols (MQTT, XMPP, AMQP, HTTPS) and proprietary transports4.

b. Serialization: Raw sensor messages are serialized on the gateway using the "SurgeCloud" IoT Data Serialization Algorithm (SurgeCloud_encoder.c/SurgeCloud_decoder.c), which applies a custom compression scheme described in Detailed Design Document v1.0.2, Section 12 Data Model1.

c. Stream Ingestion: Serialized payloads are ingested into Azure Event Hubs or Kafka Data Pipelines, then processed by Apache Spark Streaming jobs implemented in edge_compute.go to perform real-time analytics within 50 ms per message15.

d. Storage: Processed telemetry is stored in Cassandra using the telemetry_schema.cql schema optimized for 400,000 messages per hub per day1. Cold data is offloaded to Azure Blob Storage for long-term retention.

e. Analytics & Insights: Machine-learning workloads run on stored data via Azure Databricks and integrated ML libraries, generating alerts, reports, and predictive maintenance insights.

The Core Components and Source Code Modules of the SourceCloud IoT Platform – which were modified, downloaded, and deleted by Gouru, cannot now be determined (without discovery) fully but they include some components of the following:

SurgeCloud Data Serialization

- Files: SurgeCloud_encoder.c, SurgeCloud_decoder.c

- Function: Implements a custom binary format that reduces payload size by ~60% versus Avro/Protobuf, using a Huffman-based differential compression scheme1.

Telemetry Schema

- Script: telemetry_schema.cql

- Structure: Defines partition keys and clustering orders for high-throughput time-series data in Cassandra; partitions by device ID, clusters by timestamp to facilitate range queries1.

Presentation-Layer State Management

- Files: store.js, dispatcher.ts

- Pattern: Implements a unidirectional data flow where actions dispatched from UI components update an immutable store; view layers subscribe to store changes, preventing race conditions1.

Real-Time Analytics Module

- File: edge_compute.go

- Mechanism: Leverages Apache Spark Streaming with custom parsers to process incoming telemetry in micro-batches, supporting user-defined rule engines for alarms and geofencing.

Gateway Handshake Protocol

- Files: g2021es_handshake.c, g2021es_cert_config.json

- Role: Enforces mutual TLS authentication between devices and the Surge Gateway, managing digital certificates, session keys, and replay protection3.

Technology Stack

- Cloud Platform: Microsoft Azure (Event Hubs, Blob Storage, Service Fabric)

- Stream Processing: Apache Spark Streaming, Kafka

- Database: Apache Cassandra, Azure SQL for relational metadata

- APIs & Services: .NET Core Web API, Node.js microservices

- Front-End: Angular/React, D3.js for visualizations

- Embedded: C/C++ for gateway firmware, Go for analytics services

- Security: OAuth 2.0 IAM, Azure Active Directory, certificate-based mTLS

Data Model and Persistence / The core data model follows a layered approach:

- Device State Store (Cassandra tables defined by telemetry_schema.cql)

- Time-Series Telemetry (Partitioned by device and asset hierarchy)

- Analytical Models (Data Lake schemas, ML model registries)

- Configuration Stores (Redis/Ignite for rule definitions, ACLs)

Security and Access Control

- Super Admin Password to access

- Role-Based ACLs: Enforced across API gateways and within microservices.

- Audit Logging: All access to trade-secret code modules and sensitive configurations is logged with IP, timestamp, and user identifiers.

Deployment and Scalability

- Microservices deployed in Azure Service Fabric clusters with CI/CD pipelines via Azure DevOps.

- Auto-scaling of ingestion and analytics tiers based on message throughput.

- Edge gateway firmware updates delivered via secure OTA channels and can roll back on failure.

This architecture and source-code organization – which was modified and/or deleted by Gouru during his breaches – enable SurgeCloud IoT Platform to support enterprise-scale IoT deployments, delivering low-latency processing, strong data security, and extensible application services.

48.     Gouru was well aware that the Greenstar Trade Secrets were comprised of millions of lines of code and that it would be difficult, if not virtually impossible, to determine the depth of Gouru's sabotage and the various modifications he had made thereto.

49.     For example, on October 5, 2023, while illegally accessing and manipulating Plaintiffs' servers, Gouru intentionally deleted the source code from Plaintiff's SurgeCloud IoT platform, destroying a critical component for Plaintiffs' operations.  The source code was comprised of all executable code, configurations, and dependencies required to run the platform. The /opt directory, containing the platform's entire source code repository and executables, was deleted using rm -rf /opt/*. The deletion of the source code erased configurations tied to AI/ML

34

models, IoT integrations, and workflow automation and disabled real-time analytics, predictive maintenance, and device-to-enterprise communication. The /data/sierra-log directory, storing audit trails and compliance records, was erased via rm -rf /data/sierra-log-* and Gouru also deleted logs recording system transactions, user activities, and operational metrics. These actions also eliminated audit trails, making forensic analysis and incident reconstruction nearly impossible and hindered compliance reporting and debugging capabilities.

50.    Plaintiffs have now documented that between September 18, 2023 and October 5, 2023, Gouru, while at his residence in Belle Mead, New Jersey, unlawfully and without any authorization from Plaintiffs, gained access to Plaintiffs' servers on 22 separate occasions as reflected on Exhibit H hereto. On those 22 occasions, Gouru spent a total of **over** 470 hours: (a) accessing and stealing the Greenstar Trade Secrets from Plaintiffs' virtual servers and/or (b) providing access to LG and/or its parent company to Plaintiffs' servers for them to assist with the theft and/or modification of the Greenstar Trade Secrets, and/or for them to observe or otherwise utilize the Greenstar Trade Secrets on said servers. During these 22 breaches, Defendant Gouru intentionally deleted critical files and directories from Plaintiffs' servers, including the entire source code repository located in `/opt/*` and application transaction logs in `/data/sierra-log-*`, thereby destroying Plaintiffs' operational copies of critical parts of the Greenstar Trade Secrets and impairing Plaintiffs' systems. This act constituted an improper acquisition by destruction and an attempt to conceal the theft. Gouru only ceased his illegal activities when Plaintiffs changed the login credentials and shut down the server infrastructure access. However, that did not stop him and others from attempting to gain unlawful access and/or from planning with LG for the use thereof

51.     Upon information and belief, the primary reason that Gouru spent over four hundred

hours over the course of these unauthorized accesses was because during this time he was downloading – i.e., stealing from Plaintiffs – the millions of lines of code on the SurgeCloud IoT platform. and/or allowing his computer to provide access to the Greenstar Trade Secrets to employees of LG and/or its parent company.

52.     Due to his intimate knowledge of Plaintiffs' virtual server infrastructure and logistical operations, Gouru was fully aware that he could secretly conduct his unauthorized access and spend an extensive amount of time downloading, modifying and/or providing access to the Greenstar Trade Secrets without being detected by Plaintiffs.

53.      Gouru's deliberate intent to inflict damage and steal proprietary information is evident. Comcast, Gouru's internet service provider, has confirmed that the IP address used for the 22 separate breaches, totaling over 470 hours, was indeed linked to Gouru's home address.

54.     The result of these actions is that Gouru and LG possess the only unmodified versions of the Greenstar Trade Secrets, and the modified versions that Gouru left to Plaintiffs do not function properly. These illegal and improper actions by Gouru and others on behalf of LG have caused Plaintiffs to lose the benefit of more than twenty-five million dollars ($25,000,000.00) expended by Plaintiffs in development of the Greenstar Trade Secrets, which are currently of no benefit to them, plus projected lost profits likely to involve at least hundreds of millions of dollars.

**LG's Participation in and Benefit from the Theft and Conversion of Plaintiff's Trade Secrets**

55.     Upon information and belief, LG hired Gouru as its Director of Data Solutions to gain access to Plaintiffs' trade secrets, including the Greenstar Trade Secrets. LG must have been

aware of and indeed authorized and ratified the illegal accessing of Plaintiffs' servers from LG facilities. Employees of multi-national technology companies like LG are obligated to adhere to stringent information technology ("IT") security protocols, which protocols are designed to protect the companies' assets and systems as well as those of their clients and third-party partners. An employee would be required to have obtained explicit permission from senior management or the IT department to access third-party cloud environments, particularly from within the company's office network. Such access requires opening an "SSH" (secure shell port) session via "port number 22", a process that would be closely monitored and logged by the company. Any attempts to access third-party infrastructure such as Plaintiffs' cloud environment would likely trigger and be recorded in firewall logs, ensuring that such activities are transparent to management. Gouru conducted these activities as LG's Director of Data Solutions. Access from LG's New Jersey IP address 136.166.251.100 suggests corporate awareness or involvement Therefore, upon information and belief, LG had to approve Gouru's use of his company computer to gain access to Plaintiffs' servers, which he did on five (5) separate occasions (Please see Exhibit B hereto) for a total of over twenty-seven (27) hours.

56.     In a deliberate and fraudulent attempt to acquire and plan to utilize the stolen intellectual property of Plaintiffs, LG also sent Gouru, in his capacity as Director of Data Solutions, to the offices of its parent company in South Korea. Gouru's mission was to educate the parent corporation's technology team about the full functionality of the stolen Greenstar Trade Secrets, and to teach the team how to gain access thereto. This action clearly demonstrates LG's intent to exploit the stolen intellectual property for its own gain, underscoring the premeditated and unethical nature of their conduct and Gouru's conduct on its behalf.

57.     Plaintiffs have determined that multiple documented attempts to access Plaintiffs' servers were made from an IP address 124.56.66.38 at LG POWERCOMM, a subsidiary of LG Electronics South Korea on October 1, 2023, during which time a representative of LG or its parent company in South Korea made at least 31 attempts to illegally access Plaintiffs' servers. Relatively contemporaneously, there were other attempts to access Plaintiff's servers from other IP addresses located in South Korea.  These constitute further attempts by or at the direction of LG and its affiliates to acquire or use the Greenstar Trade Secrets. Upon information and belief, as set forth above, Defendant LG or its parent company as a result of obtaining access thereto from LG, Defendants have used, or threaten to use, the Greenstar Trade Secrets, including by incorporating or intending to incorporate them into LG's IoT product line and other products or services, which would grant LG an unlawful competitive advantage derived directly from the misappropriated trade secrets.

58.     Such attempts by LG's parent company were at the request of and/or based upon input from LG and Gouru in his capacity as Director of Data Solutions for LG, and while acting on behalf of LG.

59.     Thus, as also set forth in the Introduction section hereof, which is incorporated herein by reference, as the Director of Data Solutions of LG, Gouru advised one or more employees of LG's parent company as to how to attempt to gain unauthorized and illegal access to the Greenstar Trade Secrets.  In addition, one or more employees of LG's parent company attempted to gain such unauthorized and illegal access on thirty-one (31) separate occasions (Please see Exhibit J).

60.     As set forth in the preceding paragraphs, Gouru's efforts, undertaken as an employee of LG and member of its management with the title of Director of Data Solutions, were

38

driven by a premeditated intent to ensure that Plaintiffs would be unable to recover the Greenstar Trade Secrets so as to compete with LG.   Their deliberate strategy was aimed at securing exclusive access to these trade secrets for LG. Upon information and belief, Gouru intended for LG and its parent company to be the sole entities in possession of these valuable trade secrets, allowing them to use and exploit this information for their substantial benefit, while causing extreme detriment and very significant damages to the Plaintiffs.

61.    Gouru and LG intended to enable LG and/or its parent company to utilize the Greenstar Trade Secrets for their significant benefit. Upon information and belief, LG's and/or its parent company's utilization of the trade secrets would transform the way LG and/or its parent company did its current business and would enable revolutionary business functionality. Such results would be achieved by using the stolen software platform to enhance the service delivery to all their existing and new customers in North America and/or globally, thereby creating a substantial increase in revenue for LG and/or its parent company. To the extent that LG's actions would benefit its parent company, that would also benefit LG and/or its management from the parent company's use, also resulting in LG's use and/or favorable treatment of LG's management by the parent company.

62.    Upon information and belief, Gouru, again as a member of management and employee of LG, also intended that his actions would eliminate Plaintiffs from being competitive with LG with respect to the benefits derived from the stolen Greenstar Trade Secrets, in that he acted with their approval to deprive Plaintiffs of the use of the stolen Greenstar Trade Secrets. Upon information and belief, Gouru's activities with LG's parent company were expressly and/or impliedly approved and authorized by LG, by whom he was employed and paid while conducting any such activities on behalf of LG's parent company

63.     As set forth above and in the Introduction section hereof, Gouru illegally accessed Plaintiffs' servers from LG's headquarters in Englewood Cliffs, New Jersey, where Gouru was employed, on 5 separate occasions of documented unauthorized and illegal access, from September 18, 2023 to October 5, 2023. (Please see Exhibit I hereto) That unauthorized and illegal access occurred over 27 hours. Upon information and belief, LG would have had to approve this illegal and unauthorized access since Gouru was accessing another company's computer system. This further confirms LG's knowledge of and active participation with the theft of the Greenstar Trade Secrets.

64.     Additionally, on or around November 3, 2023, Gouru called the son of Greenstar's CEO and acknowledged that he had made the unauthorized break-ins to Plaintiffs' servers. Gouru further admitted that he was in South Korea at the time of the call marketing the trade secrets to LG's parent company, with the expectation that he would be compensated by LG for his transfer of the trade secrets to the company. Gouru even stated that only a company like LG could handle a platform like the stolen trade secrets at issue and that he had the capacity to persuade LG to utilize it. Gouru's primary motivation for the call was to seek assistance in obtaining further access to Plaintiffs' servers and their significant capacity because by then his access had been blocked and he wanted that access to demonstrate the full capacity of the stolen  Greenstar Trade Secrets, ultimately to increase his own compensation and that of LG and its parent company.

65.     Upon information and belief, LG and/or its affiliated companies are currently using and benefitting from the Greenstar Trade Secrets, stolen from Plaintiffs and/or are planning to use same. For example, LG's website states: "Through its industry-leading IoT technologies, LG is more committed than ever to providing consumers with an all-around better quality of life by enabling connected smart homes powered by ThinQ." https://www.lg.com/global/newsroom/lg-

story/beyond-news/enjoy-smart-living-everywhere-you-go/.  Upon information and belief, that involves use of the Greenstar Trade Secrets.

66.    In addition, LG and/or its parent company have use for many of the Greenstar Trade Secrets.  The technologies, software, data, applications, and other components of the stolen Greenstar Trade Secrets are the same or similar to those used in LG's (or its parent's) IoT Vehicle Solutions line of business  (e.g., https://www.lg.com/global/mobility), Cold Chain: Refrigeration and    Compressors    business    (e.g.,    https://www.lg.com/global/business/compressor-motor/blog/cold-chain-refrigeration-and-compressors), commercial HVAC line of business (e.g., https://www.lg.com/global/business/hvac), Occupancy Management products and services (e.g., https://www.lg.com/us/business/health-protocol-occupancy-management-solutions),    and    other LG products and services.

67.    LG's involvement in and knowledge of the illegal breaches are demonstrated by the following:

**(a)  Strategic Need and Recruitment for Benefit:**

- Plaintiffs believe that LG actively recruited Gouru specifically because of his intimate knowledge of Plaintiffs' "Greenstar Trade Secrets." These trade secrets were extremely valuable to LG, which had unsuccessfully tried to develop similar platforms, applications and/or the other items comprising the Greenstar Trade secrets for many years. This suggests a direct motive for LG to obtain the technology for its own benefit.

- The objective of the alleged scheme was to steal and convert the value of the Plaintiffs' trade secrets and technology for the benefit of LG and/or its parent corporation.

**(b) Transformative Impact on LG's Business:**

- LG's and/or its parent company's utilization of the stolen trade secrets would transform the way LG and/or its parent company did its current business and would enable revolutionary business functionality.

- This would be achieved by using the stolen trade secrets to enhance the service delivery to some or all of their existing and new customers in North America and/or globally, thereby creating a substantial increase in revenue for LG and/or its parent company. To the extent that LGs actions benefited its parent company, it would also derive benefit in that its sales include products manufactured and/or marketed by the parent company.

- The Greenstar Trade Secrets are mostly revolutionary and critical for advancing IoT technology platforms, a field LG is actively involved in.

**(c) Elimination of Competition and Exclusive Access:**

- Gouru's deletion of critical files and source code from Plaintiffs' servers was done with malicious intent to paralyze the Plaintiffs' entire cloud infrastructure and render it impossible for Plaintiffs to compete with LG and/or its parent company.

- These deliberate acts were done solely to benefit LG and himself as a LG employee and aimed at securing exclusive access to these trade secrets for LG. By damaging Plaintiffs' ability to use or sell their own technology, LG would face less competition and potentially be the sole possessor of the unmodified, functional trade secrets.

**(d) Direct Use and Marketing of Stolen IP for LG:**

- Gouru, upon information and belief, was sent by his superiors at LG to its parent company's headquarters in Seoul, South Korea, to demonstrate some or all of the

Greenstar Trade Secrets and educate the parent corporation's technology team about the full functionality and value of the stolen Greenstar Trade Secrets, and to teach the team how to gain access thereto. This action demonstrates LG's intent to exploit the stolen intellectual property for its own gain.

- Gouru also went to South Korea as an employee of LG, to market Plaintiff's trade secrets to LG's parent company.

- Gouru advised employees of LG's parent company on how to attempt unlawful access to Plaintiffs' servers, with these attempts being at the request of and/or based upon input from LG and Gouru in his capacity as Director of Data Solutions for LG, and while acting on behalf of LG.

**(e) Gouru's Alleged Admissions of LG's Benefit:**

- In a call on or around November 3,2023 to the son of Greenstar's owner, Gouru admitted to making unauthorized break-ins to Plaintiffs' servers. He further stated he was in South Korea marketing the trade secrets to LG's parent company, with the expectation that he would be compensated by LG for his transfer of the trade secrets to the company.

- Gouru even stated that only a company like LG could handle a platform like that included with the stolen trade secrets at issue and that he had the capacity to persuade LG to utilize it. His motivation for the call was to seek further server access to demonstrate the full capacity of the stolen Greenstar Trade Secrets, ultimately to increase his own compensation and that of LG and its parent company.

**(f) High Value of the Stolen Technology:**

- The Greenstar Trade Secrets were developed over more than seven years at a cost exceeding $25 million and were projected to generate hundreds of millions of dollars in income for Plaintiffs. Acquiring such developed technology without the associated R&D costs would represent a significant financial and competitive benefit to LG.

- Upon information and belief, for LG to obtain an asset of equal utility, it "would have had to pay at least what Plaintiffs paid for them , which is significantly more than $25 million".

**(g) LG's Current and Planned Use:**

- "Upon information and belief, LG and/or its affiliated companies are currently using and benefitting from the Greenstar Trade Secrets, stolen from Plaintiffs and/or are planning to use same". LG's website promoting its "industry-leading IoT technologies" is some evidence of this use as is the references above to various similar products being offered by LG.

68.     Thus, upon information and belief, LG is the primary beneficiary of Gouru's illegal activities, by acquiring valuable technology it needed, enhancing its business, gaining a competitive edge, and saving substantial development costs.

### Karunakaran's Participation in the Theft and Conversion of Plaintiff's Trade Secrets

69.     Karunakaran was employed by Pacific Controls, Inc., a company affiliated with the Plaintiffs, which did work for the Plaintiffs and was also located at 230 Davidson Avenue in Somerset, New Jersey, as a Development Engineer, and was entrusted with sensitive information,

including but not limited to having access to the cloud-based servers hosted on the Azure platform upon which the Greenstar Trade Secrets were located. .

70.    Gouru, while employed by PCCS, worked with and supervised Karunakaran with respect to work for Greenstar and/or Blue Surge, including working on the Greenstar Trade Secrets, and Gouru leveraged that relationship so as to have Karunakaran available to assist in accessing the cloud-servers and/or with respect to other efforts by Gouru in connection with the theft and planned utilization of the Greenstar Trade Secrets.

71.    Karunakaran has acknowledged Gouru's role in the theft of the trade secrets, and, upon information and belief, he aided and abetted in the conspiracy and theft of the Greenstar Trade Secrets at Gouru's request while Gouru was employed by LG and for LG's benefit.

### Additional Common Facts

72.    John Does 1 through 5 and/or ABC Corporations 1 through 5 or some of them conspired with and/or helped Gouru to gain unauthorized access to the Greenstar Trade Secrets and/or conspired with him with respect to utilization of the stolen Greenstar Trade Secrets by LG.  Their identities are not currently known.

73.    The Greenstar Trade Secrets, included information that was and is critical to the Plaintiffs' businesses and which they exercised efforts to keep confidential since the utilization and/or disclosure thereof would damage their business tremendously.  Those trade secrets are used in connection with Plaintiffs' offerings to their customers and potential customers.

74.    Gouru was fully aware that Plaintiffs were in the midst of obtaining investors and to procure a loan from the United States Department of Energy, and Gouru intended that his

wrongful conduct would preclude Plaintiffs' ability to secure same.  That loss was devastating to Plaintiffs and their business plan that Gouru had, while employed by PCCS, helped to prepare.

## **FIRST COUNT**
### **(Civil Action for Theft of Trade Secrets /**
### **Violation of Protection of Trade Secrets Statute 18 U.S.C. §§ 1836 *et. seq.***
### **(Diversion of Trade Secrets Act)**

75.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if set forth herein in their entirety.

76.    Plaintiffs are the "owners" of "trade secrets" as those terms are defined in 18 U.S.C. §§ 1839(3)-(4)

77.    The misappropriation of Plaintiffs' trade secrets was done by improper means as defined in 18 U.S.C. § 1839(6).  Those means are addressed in detail above and include, but are not limited to, hundreds of hours of unauthorized and illegal access and theft of  the Greenstar Trade Secrets by Gouru on behalf of LG.

78.    Defendant Gouru, after his resignation from PCCS (effective July 19, 2023) and subsequent employment by Defendant LG as Director of Data Solutions, was unequivocally nolonger authorized to access Plaintiffs' computer systems or the Greenstar Trade Secrets Nevertheless, between September 18, 2023, and October 5, 2023, Defendant Gouru repeatedly and without authorization accessed Plaintiffs' secure Azure virtual servers, which housed the invaluable Greenstar Trade Secrets. This unauthorized access was perpetrated using a "compute" super admin login credential that Gouru had access to during his prior engagement but was explicitly not authorized to use post-resignation. This unauthorized access occurred on at least 22 occasions from the IP address 71.59.82.228 linked to Gouru's residence in New Jersey, totaling over 470 hours of unauthorized connection, during which Plaintiffs' trade secrets were exposed

and vulnerable. Further unauthorized access occurred on at least 5 occasions from an IP address136.166.251.100 of LG CNS America Inc. / LG Electronics in New Jersey, where Gouru was employed, totaling over 27 hours of unauthorized connection between September 18, 2023, and October 5, 2023. During these extensive periods of unauthorized access, Defendant Gouru, acting for his own benefit and for the benefit of Defendant LG, acquired the Greenstar Trade Secrets. This acquisition included the downloading of voluminous amounts of proprietary source code (such as SurgeCloud_encoder.c and telemetry_schema.cql as illustrative examples of key files within the broader theft) and other confidential information constituting the trade secrets identified above, including, upon information and belief, documents and configurations related to the OKD4 2 and Rancher-Kubernetes 3 deployments.

79.     As alleged above, Defendant LG knew of, participated in, authorized, and/or ratified Gouru's misappropriation of the Greenstar Trade Secrets. Gouru conducted these illicit activities as LG's Director of Data Solutions, and the unauthorized access from LG's New Jersey IP address 136.166.251.100 strongly indicates corporate awareness, direction, or involvement in the scheme.

80.     Furthermore, upon information and belief, Defendant Gouru, acting as an employee of LG and with LG's support, traveled to LG's parent company headquarters in South Korea to demonstrate and disclose the misappropriated Greenstar Trade Secrets. Subsequently, on or around October 1, 2023, there were numerous attempts to access Plaintiffs' servers from IP address 124.56.66.38 (associated with LG POWERCOMM in Seoul, South Korea). These attempts constituted further efforts by or at the direction of LG and its affiliates to acquire or use the stolen Greenstar Trade Secrets.

81.     Defendants Gouru and LG have used, or imminently threaten to use, the Greenstar Trade Secrets. This includes, upon information and belief, intending to incorporate them into LG's forthcoming IoT product line and other products or services. Such use would grant LG an unlawful and substantial competitive advantage derived directly from the misappropriated trade secrets

82.     Defendants thereby committed misappropriation of Plaintiffs' trade secrets by improper means and are liable to Plaintiffs pursuant to 18 U.S.C. § 1836.

83.     As indicated in detail above, Defendants' actions were willful and malicious.

84.     As indicated in detail above, Defendants undertook said willful and malicious actions for their own economic gain.

85.     As indicated in detail above, Defendants' willful and malicious actions caused Plaintiffs significant damages.

86.     As a direct and proximate result of Defendants' willful and malicious misappropriation of the Greenstar Trade Secrets, Plaintiffs have suffered and will continue to suffer irreparable harm and significant damages. These damages include, but are not limited to, the loss of the immense value of their trade secrets, lost profits, the erosion of their hard-won competitive advantage, and the substantial costs incurred in developing these unique trade secrets (exceeding $25 million). Plaintiffs are entitled to damages, comprehensive injunctive relief, and, due to the willful and malicious nature of the misappropriation, exemplary damages and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3).

87.     In order to attempt to protect the Greenstar Trade Secrets from ongoing use by Defendants, Plaintiffs are entitled to a restraining order, preliminary injunction and then a permanent injunction to prevent any further misappropriation and/or utilization by any Defendant of Plaintiffs' Greenstar Trade Secrets.

88.     There is currently an order in place restraining Defendants from utilization and/or modification of said trade secrets. Same should ultimately be converted into a permanent injunction.

89.     Plaintiffs are also entitled to civil seizure as provided for in 18 U.S.C. §1836 as to Gouru's computer and related equipment at home and his work computer.

90.     Plaintiffs are also entitled to damages for actual loss caused by the misappropriation of their trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(B)(i)(I) and/or for damages for any unjust enrichments caused by said misappropriation of the trade secrets not addressed in computing the damages for actual loss pursuant to 18 U.S.C. §1836 (b)(3)(B)(i)(II).

91.     As to the damages for said actual loss, they include lost profits which Plaintiffs can establish with reasonable certainty. It is believed that said lost profits will total at least in the hundreds of millions of dollars. Only in the event that the Court concludes that said damages cannot be established by Plaintiffs would Plaintiffs seek, in the alternative, a reasonable royalty anticipated to still result in a judgment in the amount of many millions of dollars.

92.     As to the unjust enrichment as provided for in the statute, Plaintiffs are entitled to recover all of their expenses in developing the Greenstar Trade Secrets because Defendants procured those trade secrets without paying for same. In order for LG to obtain another asset of equal utility to that of the Greenstar Trade Secrets, LG would have had to pay at least what Plaintiffs paid for them, which is significantly more than $20 million.

93.     If said costs are calculated as of the date when the trade secrets were stolen, the total would exceed $25 million.

94.     Since the misappropriation was willful and malicious, Plaintiffs are also entitled to exemplary damages pursuant to 18 U.S.C. §1836(b)(3)(C).

**WHEREFORE**, Plaintiffs demand judgment as against Defendants, jointly and severally, for:

(1)  Continuation of the Restraining Order followed by a Preliminary and then ultimately a Permanent Injunction;

(2) Civil Seizure;

(3) Damages for actual loss of profits and/or damages for Defendants' unjust enrichment as indicated above;

(4) All costs incurred by or on behalf of Plaintiffs with respect to the development of the Greenstar Trade Secrets;

(5) Exemplary Damages;

(6) Counsel Fees;

(7) Costs;

(8) Such other relief as this Court deems just.

## <u>SECOND COUNT</u>
**(Violation of Fraud and Related Activity in Connection with Computer Statute 18 .S.C. § 1030 (Computer Fraud and Abuse Act))**

95.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if set forth herein in their entirety.

96.     Defendants intentionally accessed the database within the cloud computing infrastructure in Microsoft Azure in order to steal the Greenstar Trade Secrets without authorization and/or exceeded their authorized access (they were not authorized) and obtained and extracted information from a protected computer in violation of 18 U.S.C. §1030.

97.     The computers upon which the Greenstar Trade Secrets were stored and to which Gouru gained unauthorized access were protected in that they were used in and/or affect interstate

and/or foreign commerce or communication in a manner that affects interstate or foreign commerce consistent with 18 U.S.C. §1030(e)(2)(B).

98.     The actions of Defendants, as detailed above, caused an impairment to the integrity and/or availability of the Greenstar Trade Secrets which, as defined above, include programs, a system and/or information and therefore Defendants caused damage as defined in 18 U.S.C. §1030(e)(8).

99.     Gouru, on behalf of LG and for his own benefit as well as LG's benefit, accessed more than one "protected computer" as defined in the statute and did so without authorization.   In addition, such actions were done knowingly and with the intent to defraud Plaintiffs by stealing the Greenstar Trade Secrets and altering them without Plaintiffs' knowledge or authorization. Defendants Gouru and LG succeeded with the intended fraud and obtained the extremely valuable Greenstar Trade Secrets.

100.    LG, as Gouru's employer, is also responsible for its employee's actions as, upon information and belief, those actions were performed within the scope of the employment and intended to benefit the employer.   Plaintiffs allege Gouru's actions meet these criteria:

a. Gouru's Role and Purpose of Employment:

- Gouru was hired by LG as its Director of Data Solutions. Plaintiffs allege that LG actively recruited Gouru specifically because of his intimate knowledge of Plaintiffs' "Greenstar Trade Secrets," with the intent for LG to gain access to and use this technology, which LG had apparently been unable to develop itself for many years.

- This suggests that the very purpose of his employment, from LG's perspective, was tied to acquiring and leveraging the Plaintiffs' proprietary data solutions.

51

b. Actions Allegedly Directed, Sanctioned, or Facilitated by LG:

- Demonstrations and Knowledge Transfer to LG Teams: As set forth above, upon information and belief, Gouru used his illegal access to their cloud infrastructure on Microsoft Azure to conduct or facilitate live demonstrations of the Plaintiffs' platform for LG's software development teams. These demonstrations allegedly occurred on numerous occasions. Notably, Gouru was reportedly sent by his LG superiors to South Korea to demonstrate the stolen Greenstar Trade Secrets to LG's parent company's technology team and educate them on its functionality and how to access it. Plaintiffs also allege that Gouru provided broader access to LG and parent company employees, allowing them to observe and utilize the stolen platform, implying engagement with US-based teams as well, particularly given Gouru's activities and system access from LG's New Jersey headquarters.  Upon information and belief, records of these demonstrations and related internal communications would likely be found within LG's correspondence and IT monitoring systems.

- Advising on Unauthorized Access: Gouru, while acting as an LG employee, advised employees of LG's parent company on how to attempt unlawful access to Plaintiffs' servers.

- Access from LG Premises: A significant portion of the alleged unauthorized access by Gouru (five occasions, over 27 hours) reportedly occurred from LG's headquarters in Englewood Cliffs, New Jersey . Due to standard corporate IT security protocols monitoring external server access (requiring an "SSH" port

to be opened), LG management or its IT department must have been aware of and approved Gouru's activities from LG's premises.

c. Nature of the Actions Aligned with His Role (Albeit Illegally):

- As Director of Data Solutions, Gouru's actions of acquiring, analyzing, demonstrating, and planning the utilization of data platforms and technologies are presented as activities that would align with such a role, even if the means (theft and unauthorized access) were illegal .

- His travel to South Korea to market the trade secrets to LG's parent company was done as an employee of LG.

d. Intended Benefit to LG:

- Gouru's actions were intended to directly benefit LG by providing it with valuable technology it coveted for LG and/or its parent to use in connection with products marketed and/or sold by LG.

- The objective was to steal and convert the value of the Plaintiffs' trade secrets and technology for the benefit of LG and/or its parent corporation.

- The stolen Greenstar Trade Secrets would transform the way LG and/or its parent company did its current business and would enable revolutionary business functionality, leading to a substantial increase in revenue for LG.

- Gouru's deletion of critical files from Plaintiffs' servers was done with malicious intent to paralyze Plaintiffs' cloud infrastructure, eliminate them as

competitors, and ensure LG had exclusive access to the technology, all done solely to benefit LG and Gouru as an LG employee.

e. Value of the Stolen Technology:

- The Greenstar Trade Secrets were developed over more than seven years at a cost exceeding $25 million and were projected to generate hundreds of millions of dollars in income for Plaintiffs. Acquiring such developed technology without the associated R&D costs would represent a significant financial and competitive benefit to LG.

- For LG to obtain an asset of equal utility, it would have had to pay at least what Plaintiffs paid to develop them, which is significantly more than $20 million.

f. LG's Current and Planned Use:

- Upon information and belief, LG and/or its affiliated companies are currently using and benefitting from the Greenstar Trade Secrets, stolen from Plaintiffs and/or are planning to use same.

g. Gouru's Admissions:

- In a call, Gouru admitted to the son of Greenstar's owner, unauthorized break-ins and stated he was in South Korea marketing the trade secrets to LG's parent company, expecting compensation from LG for this transfer. He allegedly stated that "only a company like LG could handle a platform like the stolen trade secrets".

101.    Thus, Gouru's violations of the CFAA were not personal acts outside of his job, but rather actions directly related to his responsibilities as LG's Director of Data Solutions, and as set forth above Gouru's acts were encouraged, known, or even directed by LG, and undertaken for LG's substantial strategic and financial benefit.

102.    Defendants Gouru and LG violated the CFAA by:

- Intentionally accessing Plaintiffs' protected computers (cloud computing infrastructure on Microsoft Azure) without authorization.

- Doing so knowingly and with the intent to defraud the Plaintiffs, by stealing the Greenstar Trade Secrets and altering them.

- Obtaining valuable information (the Greenstar Trade Secrets) as a result of these actions.

- Causing damage, defined under 18 U.S.C. §1030(e)(8) as an impairment to the integrity or availability of data, a program, a system, or information.

- Causing loss to Plaintiffs as defined in 18 U.S.C. §1030(e)(11), including costs to respond to the offense, conduct damage assessments, restore data, and lost revenue.

103.    As a direct and proximate result of Defendants' violations of the CFAA, Plaintiffs have suffered damage and loss and are entitled to compensatory damages and injunctive or other equitable relief.

104.    The actions of the Defendants, as detailed above, caused Plaintiffs to incur a loss as defined in 18 U.S.C. §1030(e)(11) in that Plaintiffs incurred reasonable costs and/or also incurred a loss of revenue projected to be in the hundreds of millions of dollars.

105.    Plaintiffs are entitled to obtain compensatory damages and injunctive relief pursuant to 18 U.S.C. §1030(g).

106.    Plaintiffs are also entitled to recover for all of their costs of responding to the theft of the Greenstar Trade Secrets, conducting a damage assessment and/or efforts to restore the data, program and/or information to its condition prior to the theft, which costs were incurred and are substantial.  These costs include (a) $21,880.00 paid to eForensix, LLC (for responding to the offense and conducting a damage assessment, forensic investigation, log analysis, and assessment of the scope and impact of the unauthorized access and data deletion), (b) $86,400.00 paid to Oriona Global Systems DWC, LLC for restoration of data, programs, systems, and information to their condition prior to the offense; labor and resources required to restore deleted source code (formerly in `/opt/*`), transaction logs (formerly in `/data/sierra-log-*`), and system configurations from available backups, and to verify system integrity; costs to re-secure computer systems following the breach; for resetting compromised credentials, reconfiguring security protocols, and hardening server access controls; for implementing enhanced security measures; for deploying enhanced intrusion detection systems, log monitoring tools, and other security upgrades, (c) $40,000.00 paid to Roshen George to conduct testing and auditing of cloud infrastructure and to secure the cloud infrastructure, extract data logs, and support the forensic audit, and (d) legal fees related to the costs of investigation of the costs of recovery.

**WHEREFORE**, Plaintiffs demand judgment as against Defendants, jointly and severally, for:

(1) Continuation of the Restraining Order followed by a Preliminary and then ultimately a Permanent Injunction;

(2) Compensatory Damages;

(3) All of Plaintiffs' costs of responding to the theft of the Greenstar Trade Secrets, conducting a damage assessment and/or efforts to restore the program and/or information to its condition prior to the theft;

(4) Counsel Fees;

(5) Costs;

(6) Such other relief as this Court deems just.

## **THIRD COUNT**
### **(Racketeer Influenced and Corrupt Organization liability pursuant to 18 U.S.C. §§ 1961 *et seq.*)**

107.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if set forth herein in their entirety.

108.    Both Plaintiffs and Defendants are persons as defined in 18 U.S.C. §1961.

109.    This count is brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. The RICO Enterprise is comprised of defendants Ramakrishna Reddy Gouru ("Gouru") and LG Electronics USA, Inc. ("LG"), along with other known and/or unknown individuals and entities, including certain employees or agents of LG's parent company in South Korea (such as "Vivek" as referenced in Exhibit K, p. 8) and peripherally Mr. Karunkaran. They formed and constituted an "association-in-fact enterprise" (the "Intellectual Property Theft Enterprise" or "IPT Enterprise") within the meaning of 18 U.S.C. § 1961(4).

110.    The IPT Enterprise was/is an ongoing organization, formal or informal, whose members and associates functioned as a continuing unit for the common purpose of unlawfully acquiring Plaintiffs' valuable Greenstar Trade Secrets, impairing Plaintiffs' computer systems, and leveraging the stolen intellectual property for the commercial benefit of LG and its affiliates, thereby unlawfully enriching the enterprise and its members.

111.    Gouru served as a key operative, leveraging his insider knowledge and previously authorized (but subsequently revoked) access credentials to perpetrate the unauthorized access, download trade secrets, and execute destructive commands on Plaintiffs' systems. He also acted as a liaison, conveying stolen information and technical know-how to other members of the enterprise at LG and its parent company. LG, acting through its officers, employees (including Gouru as Director of Data Solutions), and agents, directed, facilitated, funded (e.g., Gouru's trip to South Korea), and benefited from the enterprise's unlawful activities. LG, acting through its officers, employees and agents (which precise individuals to be determined through discovery) provided resources (such as network access from its New Jersey facility – Exhibit K, p.3) and, upon information and belief, strategic direction for the acquisition and intended use of the stolen trade secrets. Including continued and ongoing use with LG's efforts to develop, market and sell the products similar to the Greenstar Trade Secrets, such as LG's (or its parent's) IoT Vehicle Solutions line of Business (e.g., https://www.lg.com/global/mobility), Cold Chain: Refrigeration and Compressors business (e.g., https:// www.lg.com/global.business/compressor-motor/blog/cold chain-refrigeration-and-compressors), commercial HVAC line of Business (e.g., https://www.lg.com/global/ubusiness/hvac), Occupancy Management proiducts and services (eg., https://www.;g.com/us/business/health-protocol-occupancy-management-solutions), and other LG products and services. Further, the employees/agents of LG's parent company in South Korea (e.g., at LG POWERCOMM – Exhibit K, pp. 3-4, 6) participated by, inter alia, attempting to gain unauthorized access to Plaintiffs' servers based on information provided by Gouru and LG, and by evaluating the stolen trade secrets for potential use as well as use with the development, marketing and/or sale of the LG products identified above. c. Distinctness:

112.    This IPT Enterprise existed for the aforementioned unlawful purposes and had an ascertainable structure and continuity of purpose separate and apart from the pattern of racketeering activity itself, and distinct from the legitimate business operations of LG

113.    The enterprise engaged in a pattern of racketeering activity as defined in 18 U.S.C. §1961, by committing multiple predicate acts, including but not limited to: a. Multiple Acts of Wire Fraud (18 U.S.C. § 1343): On numerous occasions between September 18, 2023, and October 5, 2023, Defendant Gouru, aided and abetted by LG and other members of the IPT Enterprise, knowingly devised and participated in a scheme to defraud Plaintiffs of their valuable Greenstar Trade Secrets and transmitted, or caused to be transmitted, by means of wire communications in interstate and foreign commerce (i.e., the internet, accessing Plaintiffs' Azure servers across state lines from New Jersey, and communications related to accessing servers from/to South Korea), writings, signs, signals, pictures, or sounds for the purpose of executing such scheme. Each unauthorized login session from Gouru's New Jersey residence (22 instances – Exhibit H) and from LG's New Jersey offices (5 instances – Exhibit I) to access and exfiltrate data constitutes a distinct act of wire fraud. The attempted accesses from South Korea (31 instances – Exhibit J) further demonstrate the scope of the scheme executed via wire. b. Multiple Violations of the Computer Fraud and Abuse Act (e.g., 18 U.S.C. § 1030(a)(4) and (a)(5)(A)): As detailed in Count Two, Defendant Gouru, as part of the IPT Enterprise, repeatedly accessed Plaintiffs' protected computers without authorization, with intent to defraud, obtaining valuable information (the Greenstar Trade Secrets) and causing substantial damage and loss. c. Interstate Transportation of Stolen Property (18 U.S.C. § 2314): Upon information and belief, Defendant Gouru and other members of the IPT Enterprise transported, transmitted, or transferred in interstate or foreign commerce goods, wares, merchandise, securities or money, of the value of $5,000 or more

(namely, the Greenstar Trade Secrets, valued far in excess of $5,000), knowing the same to have been stolen, converted or taken by fraud. This includes the electronic transmission of the trade secret data from Plaintiffs' servers to locations controlled by Gouru and LG.

114. The predicate acts of racketeering activity committed by the IPT Enterprise establish a pattern in that: a. The predicate acts occurred over a substantial period of related and continuous criminal activity, commencing no later than September 18, 2023 (first unauthorized access from LG NJ) and extending through at least March 15, 2024 (the alleged date of LG's product launch incorporating the stolen "SurgeCloud" algorithm – This period of nearly six months, involving dozens of predicate acts, a complex scheme of theft, exfiltration, data destruction, and planned commercial exploitation, demonstrates a closed period of repeated conduct rather than isolated or sporadic incidents. b. The IPT Enterprise was formed for the purpose of systematic intellectual property theft to benefit LG products based thereon for sale such as those identified above, which is ongoing. The actions taken demonstrate a regular way of conducting the IPT Enterprise's illicit business to use the stolen Greenstar Trade Secrets for ongoing use with product development. Upon information and belief, unless enjoined, the IPT Enterprise poses a continuing threat to misappropriate further trade secrets or data from Plaintiffs or to unlawfully exploit other aspects of the already stolen Greenstar Trade Secrets in future LG products or services, indicating that the past conduct is a threat of repetition extending indefinitely into the future. The planned widespread commercialization of the stolen IP in LG's global product lines represents a potential long-term criminal endeavor.

115. Defendant Gouru, being employed by or associated with the IPT Enterprise (an enterprise engaged in, and the activities of which affected, interstate and foreign commerce), did unlawfully, willfully, and knowingly conduct and participate, directly and indirectly, in the

conduct of such enterprise's affairs through the pattern of racketeering activity described above. Defendant LG, as a corporate entity, also conducted or participated in the enterprise's affairs through the actions of its employees and agents, including Gouru.

116.    Defendants Gouru and LG, along with other co-conspirators, being persons employed by or associated with the IPT Enterprise, did unlawfully, willfully, and knowingly conspire, combine, confederate, and agree together and with each other to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the IPT Enterprise's affairs through a pattern of racketeering activity. Each conspirator agreed to the overall objective of the conspiracy.

117.    That pattern also included the hiring of Gouru to steal the Greenstar Trade Secrets which occurred in July 2023 or before depending upon how long the hiring process took;  illegal and unauthorized access, between September 19, 2023 and October 6, 2023 to Plaintiffs' servers on 22 occasions from Gouru's house; illegal and unauthorized access from LG's business location in New Jersey on 5 occasions; Gouru's sharing of information in South Korea on how to gain illegal and unauthorized access; at least 31 attempts to get access from computers in South Korea owned by LG's parent but with LG's implied or express consent; the fact that  Gouru, LG and LG's parent are still maintaining possession of the stolen property, including the only unmodified version of the SurgeCloud IoT platform;  the efforts by LG and/or its parent company to determine how to utilize the Greenstar Trade Secrets in connection with their businesses and the ongoing use thereof..

118.    As set forth that pattern also involves an ongoing enterprise in that it includes the facts that: (a)  upon information and belief, LG and/or its affiliated companies are currently using and benefitting from the IoT "Internet of Things" trade secrets and technologies, including the

Greenstar Trade Secrets, stolen from Plaintiffs and/or are planning to use same. For example, LG's website states: "Through its industry-leading IoT technologies, LG is more committed than ever to providing consumers with an all-around better quality of life by enabling connected smart homes powered by ThinQ." https://www.lg.com/global/newsroom/lg-story/beyond-news/enjoy-smart-living-everywhere-you-go/; (b) Gouru and LG are the only ones with the unmodified version of the Greenstar Trade Secrets and they have continued to illegally withhold same from Plaintiffs; (c) Gouru has traveled to South Korea to teach others at LG's parent company how to use the stolen trade secrets;  (d) upon information and belief, LG will continue to benefit from use of the stolen trade secrets by means of increased sales and it will continue to fund the enterprise from sales based upon its use of the stolen trade secrets in terms of its ongoing use and potential enhancements to the stolen trade secrets for LG's purposes and/or for the benefit of its parent's company's product offerings which LG sells as well; and (e) such other facts as discovery reveals.

119.    As further alleged in detail above, the actions of the co-conspirators were motivated by greed and with the expectation that theft of the trade secrets, including the Greenstar Trade Secrets, would generate huge sums for LG and its parent company.

120.    As a direct and proximate result of Defendants' actions set forth above, Plaintiffs have been injured in their business and property, including but not limited to: the loss of their valuable Greenstar Trade Secrets, costs incurred in investigating and remediating the computer intrusions and data theft, damage to their competitive position in the marketplace, lost profits and business opportunities, and damage to their infrastructure. Plaintiffs lost very substantial amounts as a result of the actions of the IPT.

121.    As a result of the foregoing, Plaintiffs sue, pursuant to 18 U.S.C. §1964 for a restraining order; for injunctive relief and for treble damages plus attorneys fees.

**WHEREFORE**, Plaintiffs demand judgment as against Defendants, jointly and severally, for:

(1) Treble Damages;

(2) Continuation of the Restraining Order followed by a Preliminary Injunction and then ultimately a Permanent Injunction;

(3) Counsel Fees;

(4) Costs;

(5) Such other relief as this Court deems just.

## FOURTH COUNT
### (Conversion)

122.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if set forth herein in their entirety.

123.    By the actions set forth above, Defendants intentionally and wrongfully converted Plaintiffs' trade secrets to their own use.

124.    Such actions, as set forth above, were intentional and malicious, intending to benefit Defendants and harm Plaintiffs.

125.    Such actions of the Defendants, as set forth above, caused Plaintiffs to incur a huge loss, anticipated to total at least in the hundreds of millions of dollars.  Such actions also caused Plaintiffs to lose the benefit of their investment of over twenty-five million dollars in the stolen trade secrets, including the Greenstar Trade Secrets.

126.    Plaintiffs are entitled to compensatory and punitive damages for the wrongful conversion.

**WHEREFORE**, Plaintiffs demand judgment as against Defendants, jointly and severally, for:

(1) Compensatory Damages;

(2) Punitive Damages

(3) Counsel Fees;

(4) Costs;

(5) Such other relief as this Court deems just.

## <u>FIFTH COUNT</u>
### (Theft of Trade Secrets)

127.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if set forth herein in their entirety.

128.     Defendants, by the actions set forth above in detail, stole the trade secrets of the Plaintiffs and are using them as if their own.

129.     Such actions were intentional and malicious, intending to benefit Defendants and harm Plaintiffs.

130.     Such actions of the Defendants caused Plaintiffs to incur a huge loss, anticipated to total at least in the hundreds of millions of dollars.  Such actions also caused Plaintiffs to lose the benefit of their investment of over twenty-five million dollars in the stolen trade secrets, including the Greenstar Trade Secrets.

131.     Plaintiffs are entitled to compensatory and punitive damages.

**WHEREFORE,** Plaintiffs demand judgment as against Defendants, jointly and severally, for:

(1) Compensatory Damages;

(2) Punitive Damages

(3) Counsel Fees;

(4) Costs;

(5) Such other relief as this Court deems just.

**SIXTH COUNT**
**(Civil Conspiracy)**

132.    Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if set forth herein in their entirety.

133.    The Defendants conspired to steal and/or wrongfully convert Plaintiffs' trade secrets and are liable for civil conspiracy.

134.    Defendants, by the actions set forth above, stole the trade secrets of the Plaintiffs and are using them as if their own.

135.    Such actions were intentional and malicious, intending to benefit Defendants and harm Plaintiffs.

136.    Such actions caused Plaintiffs to incur a huge loss, anticipated to total at least in the hundreds of millions of dollars. Such actions also caused Plaintiffs to lose the benefit of their investment of over twenty-five million dollars in the stolen trade secrets, including the Greenstar Trade Secrets.

137.    Plaintiffs are entitled to compensatory and punitive damages.

**WHEREFORE**, Plaintiffs demand judgment as against Defendants, jointly and severally, for:

(1)     Compensatory Damages;

(2)     Punitive Damages

(3)     Counsel Fees;

(4)     Costs;

(5)     Such other relief as this Court deems just.

## SEVENTH COUNT
### (Unjust Enrichment)

138.     Plaintiffs repeat and re-allege the allegations set forth in the preceding paragraphs as if set forth herein in their entirety.

139.     The Defendants received great financial benefits from their conversion and/or use of Plaintiffs' trade secrets and proprietary technology.

140.     Such benefits were received by the Defendants at the Plaintiffs' expense.

141.     It would be unjust for the Defendants to keep these benefits without compensating the Plaintiffs therefore.

142.     The defendants would be unjustly enriched if they are not obligated to pay Plaintiffs for the benefit of the stolen trade secrets and technology, which cost Plaintiffs' over $25,000,000.00.

**WHEREFORE**, Plaintiffs demand judgment as against Defendants, jointly and severally, for:

(1)     Compensatory Damages;

(2)     Punitive Damages

(3)     Counsel Fees;

(4)     Costs;

(5)     Such other relief as this Court deems just.

**DREIFUSS BONACCI & PARKER, PC**
*Attorneys for Plaintiffs, Greenstar Technologies, LLC*
*And Blue Surge Technologies, LLC,*

/s/ David C. Dreifuss
DAVID C. DREIFUSS, ESQ.

Dated: June 4, 2025

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 11.2</u>

Pursuant to Local Civil Rule 11.2 counsel hereby certified that the subject of this action is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

**DREIFUSS BONACCI & PARKER, PC**
*Attorneys for Plaintiff, Greenstar Technologies, LLC*
*And Blue Surge Technologies, LLC,*


/s/ David C. Dreifuss
DAVID C. DREIFUSS, ESQ.

Dated: June 4, 2025